# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

THOMAS MCADAMS,         }

     **Plaintiff,**          }

v.                    }        **CASE NO. CV 02-B-2288-NE**

**R. LES BROWNLEE, Acting
Secretary of the Army,**    }

     **Defendant.**        }

**ENTERED**

SEP 2 3 2004

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant R. Les Brownlee (the "Army").[1] (Doc. 22.) In his complaint (docs. 1, 13), plaintiff Thomas McAdams brings suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981(a). Plaintiff contends he was subjected to a sexually hostile work environment. He also alleges retaliation in the form of a negative performance evaluation, being transferred to a different job assignment, and having "lesser" duties to perform.[2] Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

---

[1] As originally filed, the Complaint named Thomas E. White, Secretary of the Army, as defendant. Since the filing of the Complaint, White was replaced by Les Brownlee, on May 10, 2003, as Acting Secretary of the Army. By rule, Brownlee is automatically substituted for White. Fed. R. Civ. P. 25(d)(1).

[2] Upon submission of his Opposition to Summary Judgment, plaintiff offered no evidence to refute defendant's Motion for Summary Judgment on the lesser duties claim and conceded it was not a discrete action. (Pl.'s Mem. in Opp'n to Army's Mot. for Summ. J. at 5.)



## I.    Summary Factual[3]

In 1989, plaintiff began working for the Federal Government at the UAV Project Office. (Doc. 23, Ex. 19 at 10.) From September 1995 to October 1998, plaintiff worked for Missile Guidance Directorate. (*Id.* at 14.) In April 1997, he went on a detail to the Targets Management Office ("TMO"). (*Id.* at 15.) The TMO position plaintiff held converted to a "matrix" position in October of 1998. (*Id.*) Plaintiff was selected for an Assistant Project Manager ("APM") position by Mr. Butch Norckauer, then the Director of TMO. (*Id.* at 16, 19-20; Ex. 21 at 7.) As a member of the American Federation of Government Employees ("AFGE"), plaintiff has a union agreement with the Aviation and Missile Command ("AMCOM") at Redstone Arsenal. (Doc. 28, Vol. 2, Tab E ¶¶ 6, 7.) There is no union agreement with the Simulation, Training and Instrumentation Command ("STRICOM"). (*Id.* ¶ 8.) During 1999 and 2000, the times most relevant to this suit, plaintiff was "matrixed" under AMCOM's Technical Management Directorate ("TMD") on detail to STRICOM's TMO. (*Id.* ¶ 9; *see* Vol. 2, Tab L.)

TMD provides support to other organizations by assigning its personnel to "matrix" positions within project offices that need technical support. (Doc. 23, Ex. 2 ¶ 2.) TMD assigns its personnel, including plaintiff, based on written agreements with each project office or as otherwise agreed. (*Id.*) When project offices with matrix employees no longer need the particular matrix position, the particular organization returns the

---

[3]For purposes of summary judgment all reasonable factual issues have been resolved in favor of the plaintiff.

matrix employee to TMD, the employee's base organization so the employee can be considered for other matrix positions.  (*Id.*)  TMD employees are not assured they will be assigned to a particular organization or perform a particular task.  (*Id.*)

Lieutenant Colonel Michelle Yarborough was first assigned to TMO in January 1997, became the Deputy Director of TMO, and then the Acting Director through March 2, 2000.  (Doc. 28, Vol. 1, Ex. J at 9-12.)  Mr. Jerry Sirmans became the Deputy Project Manager for Instrumentation, Targets and Threat Simulators ("ITTS") under Colonel Mark Russell in January of 1999.  (Doc. 23, Ex. 3 at 5-7.)  Management at TMO report to ITTS management.  (Doc. 28, Vol. 2, Tab G; Tab L.)  Sometime in mid 1999, Norckauer left the TMO Director position, and Yarborough was assigned his duties as the Acting Director of TMO.  (Doc. 23, Ex. 4 at 9-11.)  Around the same time, Ms. Theresa Tucker began performing the duties of Acting Deputy Director for TMO.  (*Id.* at 8-10.)  As of March 2, 2000, Tucker's permanent position was Chief of the Business Office.  (*Id.* at 6-8.)

For the July 1998 to June 1999 rating period, Yarborough, as one of his raters, gave plaintiff an "A" rating, the highest rating plaintiff could obtain, with a score of 93.  (Doc. 23, Ex. 5.)  A total score of 85 on all designated performance elements was required to receive an "A" rating.  (*Id.*)

Plaintiff alleges Yarborough subjected him to foul language, which included the following words or comments:  dick up; he has a hard on; tits up; let's gang bang; swinging dick; hears she has big balls; tight butt cheeks, and fuck. (Doc. 28, Vol. 1, Ex. A

at 51-52; Doc. 23 Ex. 6 at 22-23.)  Plaintiff states he met with Tucker, Yarborough's

subordinate, on July 27, 1999, to report his objections to some of Yarborough's foul

language. (Doc. 23, Ex. 6 at 23-24.)[4]  Plaintiff testified Tucker did not respond to his

comments about the language other than noting his complaint and objections. (*Id.* at 29.)

Plaintiff did not report the comments to anyone else or any other office at that time. (*Id.*)

In July 1999, plaintiff talked to Sirmans about problems he had with Yarborough, but did

not mention any problems with offensive language. (*Id.* at 58-62.)    On February 22,

2000, plaintiff received a Mid-Point Review from Yarborough that he felt contained

unfavorable comments. (*Id.* at 34; Ex. 7.) On March 7, 2000, plaintiff requested a first

step grievance meeting with Colonel Mark Russell. (Doc. 23, Ex. 8 at 1.) In his request,

plaintiff listed as his AFGE union representative Ms. Susan Gamble, and asked Russell to

contact Gamble to coordinate a date, time, and place for the meeting. (*Id.*)  On March 8,

2000, Colonel Russell appointed Jerome Sirmans to conduct the first step grievance

review. (*Id.* at 2.) On March 10, 2000, plaintiff met with Sirmans to discuss his

grievance, and plaintiff informed Sirmans of the offensive language used by Yarborough.

(Doc. 23, Ex. 6 at 35-36.)  As part of his resolution of the grievance process, Sirmans did

not ask others about Yarborough's language, but he did tell Yarborough that she should

stop using such phrases. (*Id.* at 36-37, 39; Doc. 28, Vol. 1, Ex. K at 38.) Yarborough

agreed to stop using language to which plaintiff objected. (Doc. 23, Ex. 6 at 39; Ex. 9 at

---

[4] Tucker testified she does not recall discussing this subject with plaintiff. (Doc. 23, Ex. 6 at 198.)

47.)  Sirmans testified that no one, including plaintiff, ever told him that Yarborough

continued to use foul language.  (Doc. 23, Ex. 6 at 41, 48-49.)

Sirmans provided plaintiff with a formal response to his first step grievance on

April 7, 2000.  (Doc. 23, Ex. 9 at 45-49.)  As part of his investigation, Sirmans "spoke

privately with fourteen people, over a five and a half week period." (*Id.* at 46.)  Sirmans

stated the comments from people he spoke with "suggest a serious problem" with

plaintiff's own conduct.  (*Id.* at 49.)  Sirmans submitted a follow-up response to plaintiff

on April 27, 2000, which addressed follow-up requests made by plaintiff at the April 7,

2000, meeting.  (*Id.* at 50-53.)

On April 13, 2000, Sirmans informed plaintiff of Sirmans's request for plaintiff to

be released back to his matrix organization, and that April 23, 2000, would be plaintiff's

last day at TMO.  (Doc. 23, Ex. 10; Doc. 28, Vol. 2, Tab E ¶¶ 12, 13.)  Within that

memorandum, Sirmans stated as background information, that on March 13, 2000, he

requested assistance in securing plaintiff another position.  (Doc. 23, Ex. 10.)  On May 4

or 5, 2000, plaintiff initiated a second level grievance related to his mid-year report, the

daily use of offensive language by Yarborough, and a new claim for abolishment of his

position.  (Doc. 23, Ex. 18; Doc. 28, Vol. 2, Tab E ¶ 15.)  He cancelled/withdrew his

second level grievance on July 11, 2000.  (Doc. 23, Ex. 20; Doc. 28, Vol. 2, Tab E ¶ 21.)

On July 11, 2000, plaintiff received a performance appraisal from Yarborough

covering the period from July 1, 1999, to April 23, 2000.  (Doc. 23, Ex. 11; Doc. 28, Vol.

2, Tab E ¶ 18.)  Plaintiff was given a score of 84, a "B" rating, which is one point below

the required 85 points for an "A" rating. (Doc. 23, Ex. 11.) Plaintiff's "B" rating

potentially caused him a monetary loss, because an "A" rating may have given him a

salary increase and a separate cash award, but it was not guaranteed. (Doc. 28, Vol. 1,

Tab I at 41-45; Vol. 2, Tab E ¶ 20.) He contacted an EEO counselor on July 27, 2000,

and met with and then filed an informal EEO complaint of discrimination on July 31,

2000, containing three complaints: 1) Yarborough abolished his position on April 23,

2000; 2) on July 11, 2000, he was notified that Yarborough gave him a "B" performance

rating; and 3) he was uncomfortable with the continued inappropriate use of language by

Yarborough. (Doc. 23, Ex. 12, Ex. 13; Doc. 28, Vol. 2, Tab E ¶ 22.) At this time, he first

became aware of the forty-five day time limit for contacting an EEO counselor to initiate

the informal complaint process. (Doc. 28, Vol. 2, Tab E ¶ 4.) Prior to July 31, plaintiff

was not notified or otherwise aware of this forty-five day requirement. (*Id.* ¶ 3.)

On August 4, 2000, Sirmans issued a Memorandum on his investigation into

plaintiff's allegations that Yarborough used foul language; Sirmans found "no evidence

of misconduct on the part of LTC Yarborough." (Doc. 23, Ex. 14.) Plaintiff filed a

formal complaint of discrimination on November 15, 2000. (Doc. 23, Ex. 15.) In his

formal complaint, plaintiff made claims for 1) job abolishment, 2) his July 11, 2000 "B"

performance rating, and 3) LTC Yarborough's inappropriate language. (*Id.* at 4.) The

EEO office noted that plaintiff's job abolishment claim appeared to be untimely, but

agreed to investigate. (Doc. 23, Ex. 16.)

An Office of Complaints Investigation ("OCI") investigation was initiated on or around May 10, 2001.  (Doc. 23, Ex. 8 at 3-4.)  An OCI Report was written after an investigation into plaintiff's EEO formal complaint, and describes the issues as: 1) whether plaintiff was subjected to a sexually hostile work environment; 2) whether plaintiff was subjected to discrimination on April 23, 2000, when his position was abolished; and 3) whether plaintiff was subjected to discrimination when he received a "B" performance rating.  (Doc. 23, Ex. 17.)  Plaintiff ultimately filed the instant lawsuit claiming: 1) Yarborough created a sexually hostile work environment; 2) he was retaliated against by the Army when his position was abolished; 3)  the Army retaliated against him when it issued a negative performance evaluation; and 4) he was retaliated against when he was given lesser job assignments.  (Docs. 1, 13.)

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a

-7-

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   Discussion of Claims

### A.   Sexually Hostile Work Environment Claim

Hostile work environment sexual harassment occurs "[w]hen the work place is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(internal citations omitted); *Cross v. State of Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995).  To prevail on an sexually hostile work environment claim, plaintiff must show: (1) he belongs to a protected class; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) it was sufficiently severe or pervasive to alter a term, condition, or privilege of his employment and create a

"discriminatorily abusive working environment;" and (5) a basis for holding the employer liable, such as the employer knew, or should have known, of the harassment and failed to take remedial action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982). To prove a hostile work environment due to sexual harassment, "plaintiff must show that but for the fact of [his] sex, [he] would not have been the object of harassment." *Henson*, 682 F.2d at 904. Where conduct is equally offensive to both sexes, the sexual harassment is not based on sex, and plaintiff has no Title VII remedy. *See id.*

Whether plaintiff was subjected to conduct that rises to a sufficient level to create a hostile environment is a legal question the court may address on summary judgment. *Mendoza*, 195 F.3d at 1244. The "mere utterance" of a remark that engenders offense does not sufficiently "affect the terms, conditions, or privileges of employment" to violate Title VII. *Henson*, 682 F.2d at 904. In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, including such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [plaintiff's] work performance." *Harris*, 510 U.S. at 23; *Edwards*, 49 F.3d 1517, 1521-22 (11th Cir. 1995). The conduct alleged must be "extreme" to alter a term, condition, or privilege of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

-9-

Plaintiff contends he was subjected to a sexually hostile work environment due to the foul language used by his supervisor, Yarborough. The language at issue includes: dick up; he has a hard on; tits up; let's gang bang; swinging dick; hears she has big balls; tight butt cheeks; and fuck. Defendant argues that plaintiff cannot show the alleged harassment occurred because of his gender, or that it was severe or pervasive enough to alter the terms or conditions of plaintiff's employment.

### 1.    Yarborough's language was not based on plaintiff's sex

For plaintiff to show he was harassed because of his sex, or gender, he must show that but for his sex, "[he] would not have been the object of harassment." *Mendoza*, 195 F.3d at 1248 n.5 (citing *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998)(Ginsberg, J., concurring). Defendant contends, and the evidence shows, that the comments to which plaintiff complains do not relate to plaintiff's gender. In fact, plaintiff himself admits that not all of the phrases were used in a sexually suggestive manner; they were Yarborough's use of slang as a way of expressing particular situations. (Doc. 23, Ex. 6 at 64-65.) In his deposition, plaintiff remembered that Yarborough had used all of the phrases, but he could not state the context in which most of the phrases were used. (Doc. 28, Vol. 1, Ex. A at 52-56.) He did remember that one day Yarborough told him "in relation to some work or program that [he] was doing "that he had big balls." (*Id.* at 55.) Yarborough told

-10-

him once that he "fucked up." *(Id* at 56.)  Plaintiff said Yarborough used the phrase

"tight butt cheeks" to refer to someone who was nervous, although to him it was sexual.

*(Id*. at 56).  According to plaintiff, Yarborough used the phrase "dicked up" as a way of

saying "something was messed up."  (Doc. 23, Ex. 6 at 64-65.)[5]  Yarborough also told

him at a meeting that his "project was 'tits up, broke.'"  *(Id*. at 64.)

   The words and phrases to which plaintiff objects can have a sexual meaning, but

the context in which they were used in plaintiff's work environment show that the use

was unrelated to sex or plaintiff's gender.  Other employees testified that Yarborough

made inappropriate comments, "but not of a sexual nature" or with a "sexual intent."

---

[5]      Mr. Aug:  Okay, when she used these phrases, . . . I know . . . the
         language is sexual but did they mean sexual –  were their actual
         meanings sexual?

         Mr. McAdams: I can't tell you.

         Mr. Aug: When she used the phrase -- "dicked up," did it have a
         sexual meaning or did it mean something was messed up?

         Mr. McAdams: It was a very inappropriate way of saying something was
         messed up.

         Investigator Biggs: I get from his testimony that all of these
         phrases are used as her way of expressing other things, not that she
         was sexually aggressive towards him.  She's -- instead of saying its
         "screwed up;" it's "dicked up;" instead of "your project's not
         working well," "your project's fucked up," or "tits up."  I mean she
         just uses language of a sexual nature in making her points.  *Id.*

(Doc. 23, Ex. 6 at 188, 263-64; Ex. 4 at 42-43.)  Tucker testified the statements were "not meant in a sexual nature." (Doc. 23, Ex. 6 at 188.)[6]

Importantly, there is no evidence before the court that Yarborough's comments were made to plaintiff because of his gender.  Plaintiff contends that he was offended by Yarborough's language.  Yarborough made the complained of remarks in the presence of both men and women, and the complained of comments referred to the anatomy of both sexes.  Both male and female employees testified that they did not interpret Yarborough's phrases as having a sexual meaning.  Yarborough did not make her comments in the presence of men or women only; she made them indiscriminately.  No reasonable jury could find that plaintiff was subjected to Yarborough's foul language because of his gender.

### 2.    Yarborough's language was not severe or pervasive enough to alter his employment

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment" from the perspective of a reasonable person "is beyond Title VII's purview" and is not actionable. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  When sexual harassment is alleged, "courts must consider the alleged conduct in context and cumulatively." *Mendoza*, 195 F.3d at 1242.  In *Mendoza*, the Eleventh Circuit

---

[6]There was also testimony that one of plaintiff's previous supervisors, Mr. Norckauer, used worse language in plaintiff's presence than the offensive language used by Yarborough. (*Id.* at 265-66, 292.)  Plaintiff talked with Norckauer on a daily basis, they were good friends, and occasionally spent time together outside of work, which suggests plaintiff was frequently subjected to foul language by people other than Yarborough. (Doc. 28, Vol. 1, Tab A at 23-24.)

found the alleged conduct was "well short of the level of either severe or pervasive conduct sufficient to alter [the plaintiff's] terms or conditions of employment." *Id.* at 1247. The plaintiff had been subject to her supervisor "constantly watching [her] and following [her] around and looking [her] up and down," and it was "in a very obvious fashion." *Id.* at 1242. The plaintiff also testified that he "looked at [her] up and down, and stopped in [her] groin area and made a . . . sniffing motion." *Id.* at 1243. In comparing decisions in other circuits, the court concluded that many decisions "rejected sexual-harassment claims based on conduct that [was] as serious or more serious than the conduct at issue in this appeal." *Id.* at 1246.

The conduct alleged by plaintiff in this case falls short of the conduct alleged in *Mendoza*. There is no evidence that Yarborough intended her comments to have a sexual meaning. Plaintiff was never propositioned or touched inappropriately by Yarborough. (Doc. 28, Vol. 1, Tab A at 65.) A reasonable person in plaintiff's position would not find that Yarborough's comments are sufficiently severe or pervasive to alter the terms and conditions of employment, or view the work environment as hostile, offensive, or abusive. Therefore, defendant is entitled to judgment as a matter of law on plaintiff's sexually hostile work environment claim.

### B.   Retaliation Claim

#### 1.   Direct Evidence

The Eleventh Circuit has held that "[d]irect evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption,"

and it "is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)(quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999))(citations and quotations omitted); *Maynard v. Board of Regents of Div. of Univ. . . .*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) ("Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption.")(citations and quotations omitted).[7]  To constitute direct evidence, the statement at issue must be that of a decision-maker to the challenged decision. *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1096, 1105 (11th Cir. 2001); *Trotter v. Bd. of Trustees of Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996) *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) (O'Connor, J., concurring) ("Thus stray remarks in the workplace . . . cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria.  Nor can statements by nondecisionmakers . . . ."), *see also id.* at 251 (plurality opinion of Brennan, J.) (plaintiff

---

[7]The court notes Judge Tjoflat's opinion in *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1300 (11th Cir. 1999), where he stated the proposition that direct evidence is no longer defined as evidence that proves the existence of the facts and issues without inference or presumption.  However, "Judge Tjoflat's definition of direct evidence 'is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel joined that portion of the opinion.'" *Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1123 n.11 (S.D. Ala. 2000)(quoting *Copley v. Bax Global, Inc.*, 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000)).  The Eleventh Circuit recently reasserted the well-established definition of direct evidence in *Maynard*, 342 F.3d at 1289, which is set forth above and has been applied in this case.

must show remarks played a part in the particular hiring decision); *Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The Eleventh Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998)(citations omitted).

In his brief and at the summary judgment hearing, plaintiff's counsel alleged there was direct evidence of retaliation in this case.  In his deposition, when asked why Bragg retaliated against him, plaintiff testified that Bragg told the union representative, Ms. Susan Campbell, "that since I filed a grievance and then filed a complaint that things would go bad for me."  (Doc. 28, Vol. 1, Tab A at 62.)  This statement is not direct evidence of retaliation because it does not prove the existence of retaliation without inference or presumption.

Plaintiff also cites a response made by Sirmans to the investigating EEO officer: "Mr. Sirmons [sic] said he did state to [plaintiff] and his union representative, which would have been Susan Gamble, that if he had not filed a grievance, his position might not have been abolished."  Sirmans replied: "Yes, I said that."  (Doc. 28, Vol. 1, Tab K at 99.)  However, Ms. Gamble clarified the statement:

> Ms. Gamble:  . . . And, when Mr. Sirmons [sic] said that STRICOM was abolishing the position, I asked him if he was abolishing the job because [plaintiff] has filed the grievance.  And he said, "Well, yes."

Investigator Biggs: And, that was the extent of those clarifications?

-15-

> Ms. Gamble: He said that because of the grievance, they had looked at the structure of the Targets Management Office and had come to the conclusion that they really didn't need an APM.

(Doc. 28, Vol. 1, Tab M at 167.)

Gamble's testimony shows that as a result of plaintiff's grievance, his supervisors decided to evaluate the overall structure of the TMO, and upon doing so, they decided plaintiff's position, assistant project manager, was not necessary.  Sirmans informed plaintiff of the decision to eliminate the APM position over one month after plaintiff initially filed his grievance.  (*See* doc. 23, ex. 8; ex. 10.)  At the time plaintiff was notified of the decision, he was given a memo detailing several reasons for the decision. Sirmans's comments in context do not constitute direct evidence of retaliation.

### 2.    Circumstantial Evidence

Because there is no direct evidence of retaliation, plaintiff must establish his case using circumstantial evidence.  Therefore, the court will follow the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).[8]  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *See Burdine*, 450 U.S. at 252-53.  If plaintiff successfully establishes a prima facie case, the burden of production

---

[8] "[T]he same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the *McDonnell Douglas* presumption." *Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999)(citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)).

shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the

employment action. *See McDonnell Douglas*, 411 U.S. at 802. If defendant succeeds in

carrying this burden, then plaintiff must prove that defendant's articulated reasons are a

mere pretext for unlawful retaliation. *See Burdine*, 450 U.S. at 253. At all times, plaintiff

bears the burden of persuasion on the ultimate question of whether the defendant acted

with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

If the plaintiff does not proffer sufficient evidence to create a genuine issue of material

fact regarding whether each of the defendant employer's articulated reasons are unworthy

of credence, the employer is entitled to summary judgment on the plaintiff's claim. *See*

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

### a.   Prima Facie Case

Plaintiff alleges the defendant retaliated against him for having engaged in

protected activity by 1) giving him a lower performance appraisal than he previously

received, and 2) by transferring him to a different position. Plaintiff has failed to

establish a prima facie case of retaliation on either of these claims.

To establish a prima facie case of retaliation, plaintiff must show: 1) he engaged in

protected activity; 2) he suffered an adverse employment action; and 3) there was a causal

link between his protected activity and the adverse employment action. *Gupta v. Florida*

*Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Farley v. Nationwide Mut. Ins. Co.*,

197 F.3d 1322, 1336 (11th Cir. 1999); *Little v. United Technologies*, 103 F.3d 956, 959

(11th Cir. 1997); *Coutu v. Martin County Bd. of County Comm'rs.*, 47 F.3d 1068, 1074

(11 Cir. 1995)(per curiam).  "To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.  In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)(internal citations and quotations omitted).

To constitute an adverse personnel action, plaintiff must have been subject to a tangible employment action – a serious and material change in the terms, conditions, or privileges of his employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  Plaintiff urges the court to apply the standard for adverse employment decisions set out in *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998). However, in *Williams v. West*, No. 99-14939, at 5 (11th Cir. Jun. 19, 2000), an unpublished decision attached to defendant's reply brief as appendix A, the Eleventh Circuit held that *Wideman* does not apply to federal employees, such as plaintiff.  A federal employee must demonstrate discrimination in "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Id.* (quoting *Page v. Bolger*, 645 F.3d 227, 233 (4th Cir.)(en banc), *cert. denied*, 454 U.S. 892 (1981)). Although proof of economic consequences is not required, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis*, 245 F.3d at 1239.

-18-

Plaintiff alleges his "B" performance rating was negative and unwarranted, and that it affected his compensation.  The receipt by plaintiff of the second highest performance rating was not a negative, or adverse, personnel action.  Also, the alleged economic impact on plaintiff's compensation was in the nature of a bonus, and therefore, does not constitute a materially adverse action.  *See Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996)("loss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus"); *Hartsfield v. Miami-Dade County*, 90 F. Supp. 2d 1363 (S.D. Fla. 2000) (a low performance rating resulting in a $600 bonus loss was not a materially adverse employment action).  Plaintiff's "B" rating is the second highest the Army can give, and his score of 84 is the highest "B" score possible.  Additionally, plaintiff's salary did not decrease as a result of his "B" rating, and even if plaintiff received an "A" rating, he was not guaranteed a bonus or cash award.  (*See* Doc. 28, vol. 1, tab I at 41-45.)

A performance appraisal is not an "ultimate employment decision," and therefore cannot form the basis of a discrimination or retaliation claim in the Eleventh Circuit.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001).  Although plaintiff's "B" score on his performance evaluation did not meet his expectations, it does not constitute an adverse personnel action.  *See Id.* ("[n]egative performance evaluations, standing alone, do not constitute adverse employment action").  A federal employee must demonstrate discrimination in an ultimate employment decision such as hiring, granting leave, promotion, and compensation.  Here, plaintiff's allegedly adverse "B" performance

-19-

appraisal is not an adverse employment decision sufficient to make it the subject of a retaliation claim.

Moreover, there is no evidence on which a reasonable jury could find a connection between plaintiff's protected activity and his performance appraisal. Yarborough first noted problems with plaintiff's performance in plaintiff's mid-point review, which eventually resulted in plaintiff's "B" performance rating. Yarborough's mid-point review occurred before she learned of plaintiff's protected activity. Plaintiff's protected activity occurred when he filed a first step grievance in response to his mid-level performance evaluation on March 7, 2000. Plaintiff's grievance stemmed from his disagreement with Yarborough's mid-point review of his performance, and from her use of language offensive to him. Yarborough stated she learned about inappropriate language allegations in March 2000, after plaintiff filed his grievance, and plaintiff has no evidence she knew of his complaints before March 2000.

With regard to plaintiff's second claim of retaliation, the elimination of his Matrix position, plaintiff has not established a prima facie case because the transfer of plaintiff was not an adverse personnel action. Plaintiff was a "matrix" employee. He was technically an employee of TMD, the matrix organization. Matrix employees, by definition, are subject to a transfer or return to their base organization, whenever the project office determines they no longer need the particular matrix position. Additionally, plaintiff's salary was not adversely affected as a result of his transfer out of the APM position at TMO. Thus, he was not subject to an adverse personnel action.

-20-

Plaintiff testified that Yarborough began the process of eliminating his position in July 1999. Thus, accepting this testimony as true, there cannot be a causal connection between plaintiff's complaint of discrimination and the decision to eliminate his position. Moreover, testimony at the OCI by one of plaintiff's own witnesses, Sutherland, was to the effect that the actions of the managers within STRICOM were not related to plaintiff's protected activity, but instead resulted from internal fighting for monetary funds and animosity between the two organizations. (Doc. 23, Ex. 6 at 218-20.)

### b.    Legitimate, Non-discriminatory Reasons

Even assuming a prima facie case, the defendant has articulated legitimate, non-discriminatory reasons for the decisions at issue. Yarborough testified plaintiff had problems working with certain outside organizations and other Division Chiefs within the organization, and he had problems communicating. (Doc. 23, Ex. 1 at 30-37, 47-56.) The organization changed, requiring plaintiff to communicate more than in the past. (*Id.*) Plaintiff admitted having problems with Beaufait. (*Id.* at 57-58.) Upon his investigation, Sirmans also documented that plaintiff had a communication problem. (Doc. 23, Ex. 6 at 123-138.) Sirmans testified plaintiff had problems with Beaufait, among others. (*Id.* at 123-24, 146-48.) Therefore, Yarborough had legitimate reasons for her decision to give plaintiff a "B" performance score of 84.

Defendant also cited legitimate reasons for transferring plaintiff. In his memo to plaintiff, Sirmans cited some of the reasons for transferring him: the APM position did not fit well into TMO's management structure, the functions performed by the APM

position were best handled within TMO, and the organizational structure made it very difficult to effectively communicate. (Doc. 23, Ex. 10; Ex. 6 at 84-95.) Plaintiff even testified there was an "inherited problem" with his position. (Doc. 23, Ex. 6 at 148.) Plaintiff's previous supervisor, Norckauer, affirmed that friction between TMO and STRICOM may have contributed to the elimination of plaintiff's position. (Doc. 23, Ex. 21 at 17, 21-22.)

### c. Pretext

In his opposition brief, plaintiff argues that defendant's articulated reasons are factually disputed. (Pl's Br. in Opp. at p. 18-21.) Even so, this does not show that any of defendant's articulated reasons are unworthy of credence, or that defendant's articulated reasons are pretext for retaliatory conduct. Plaintiff challenges defendant's reasons for his "B" performance rating by pointing to a number of people who testified they had no problems working with the plaintiff. However, the evidence before the court is that plaintiff did have communication problems with co-employees. Plaintiff's evidence does not establish pretext as to the legitimate non-discriminatory reasons for his "B" performance rating. Plaintiff has not satisfied his burden to show that genuine issues of material fact remain.

Plaintiff also challenges defendant's reasons for eliminating his position. He contends there was no indication of problems with the TMO organization in the "Climate Survey" in August 1999. However, by March 2000, the organizational structure had changed. Plaintiff fails to take into account, or rebut, the organizational changes within

TMO that the defendant believed made the APM position unworkable. Specifically, the reorganization required greater and better communication between division chiefs. (Doc. 23, Ex. 1 at 47-56.) Also, Beaufait testified that as projects progressed, there was no need for the APM position; it became unnecessary (doc. 23, Ex. 6 at 270) and plaintiff's matrix position was not refilled after it was eliminated. (*Id.*)

Plaintiff has not presented evidence on which a reasonable jury could find that defendant's articulated reasons for the challenged "adverse" personnel decisions are pretext for unlawful retaliation.[9] Therefore, defendant is entitled to judgment as a matter of law on plaintiff's retaliation claims.

## IV.   Conclusion

For the reasons stated herein, defendant's Motion for Summary Judgment will be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously with this Opinion.

**DONE** this the 22nd day of September, 2004.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

_____

[9]Defendant also argued that plaintiff did not follow the required administrative procedures with regard to his claim concerning the abolishment of his position. Because the court finds defendant is entitled to judgment on the merits, it will not address defendant's argument that this claim should be dismissed for failure to timely raise a claim in the administrative process.

-23-